[911 NYS2d 412]

In the Matter of FRIENDS FOR LONG ISLAND'S HERITAGE, Petitioner. ANDREW M. CUOMO, Attorney General of the State of New York, et al., Appellants; WEDGWOOD SOCIETY OF NEW YORK, Intervenor-Appellant; COUNTY OF NASSAU et al., Respondents.

Second Department, November 16, 2010

## APPEARANCES OF COUNSEL

*Andrew M. Cuomo, Attorney General*, New York City (*Benjamin N. Gutman* and *Ann P. Zybert* of counsel), appellant pro se, and for New York State Education Department, appellant.

*Debevoise & Plimpton LLP*, New York City (*Benjamin Sirota, Rebecca G. Mangold*, and *Susan A. McMahon* of counsel), for Wedgwood Society of New York, intervenor-appellant.

*John Ciampoli, County Attorney*, Mineola (*Lori Barrett* and *Peter J. Clines* of counsel), for County of Nassau, respondent.

*Christine Malafi, County Attorney*, Hauppauge (*John R. Petrowski* of counsel), for County of Suffolk, respondent.

*Farber Rosen & Kaufman, P.C.*, Rego Park (*Joseph Farber* and *Richard C. Lunenfeld* of counsel), for New York Community Bank, respondent.

*Benton J. Campbell, United States Attorney, Eastern District of New York*, Brooklyn (*William Young* of counsel), for United States Small Business Administration, respondent.

## OPINION OF THE COURT

FISHER, J.P.

The principal issue presented on this appeal, one of apparent first impression in this state, is whether, in a judicial dissolution proceeding pursuant to Education Law § 216-a (4) (d) (13) and Not-For-Profit Corporation Law § 1102 (a) (2) (E), the Supreme Court may order that assets held for a limited purpose by the dissolving corporation be used or sold to pay its creditors, and, if so, what, if any, are the limitations on the court's discretion in doing so.

In 1964, Friends of the Nassau County Historical Museum was granted a provisional charter, made absolute in 1969, from the New York State Board of Regents (hereinafter the Board of Regents) to operate as a not-for-profit educational corporation. Its purpose was to assist the Nassau County Historical Museum (hereinafter the Museum) in the "development and promotion of a historical interpretation and educational program . . . including activities of the . . . museum, county historic sites and Old Bethpage, a village restoration"; its duties included soliciting members of the public for donations of historical materials for the Museum. In 1980, the corporation changed its name to Friends for Long Island's Heritage (hereinafter Friends).

From 1964 until 2002 Nassau County (hereinafter Nassau) acquired approximately 35,000 objects for its museum collec-

tions through Friends. Friends obtained those objects through purchases and gifts. Friends also managed Nassau's landmark properties pursuant to a license agreement. Friends also established a relationship with the Suffolk County Department of Parks, Recreation and Conservation.

In 1997, Friends's president, Gerald S. Kessler, and Mark Levine executed a "Loan and Gift Agreement," which provided that the "Donald and Marsha Levine Ceramics and Glass Collection" (hereinafter the Levine Collection) would be received at the collection center at Sands Point, where a determination would be made as to which items would become part of the permanent collection, and which items would be sold. Sale proceeds would be placed in a restricted fund to be used to acquire additional ceramics to enhance the Levine Collection, to establish a center for the study of English ceramics at Sands Point, to provide funds for the restoration of pieces in the collection, and to provide for the payment of administrative expenses related to the Levine Collection. The agreement also provided that, even after acceptance into the collection, selected pieces could be sold, and the proceeds would be placed in the restricted fund. Nassau already possessed another collection of ceramics at Sands Point, the Buten Collection of Wedgwood Ceramics (hereinafter the Buten Collection), which was on display at the Sands Point Preserve.

In 2000, Friends received $250,000 (hereinafter the Campbell Fund) from the estate of Jeanette H. Campbell, pursuant to a provision in her will which stated that the bequest was made "provided that [Friends] establish a permanent endowment fund with said bequest, the earnings from such fund to be used for the maintenance and repair of the buildings at the Old Bethpage Restoration in Bethpage, New York."

At some point, Nassau became dissatisfied with Friends's performance of its obligations and, in December 2002, terminated a 1974 agreement under which Friends was to maintain, use, and preserve certain of Nassau's landmark properties. Between 2002 and 2005, Friends ceased acquiring objects for Nassau's museums. Additionally, in September 2004, after an audit by the Suffolk County Comptroller of Friends's performance between 2000 and 2002 of certain obligations in Suffolk County, Suffolk County (hereinafter Suffolk) also terminated its agreements with Friends.

In late 2004, Friends's trustees adopted a resolution to dissolve the corporation. In May 2005, the Board of Regents ap-

proved judicial dissolution of Friends, and in December 2005, Friends filed a petition, amended in December 2006, for judicial dissolution pursuant to Not-For-Profit Corporation Law § 1102. Various entities and individuals made claims against Friends. These claims included, inter alia, secured claims totaling $438,422.39 by the United States Small Business Administration (hereinafter SBA) and the New York Community Bank (hereinafter the Bank); unsecured creditors' claims totaling $266,045.43; and employees' claims totaling $44,100.70. In addition, Friends's president made a claim, which Friends disputed, for additional compensation, and Nassau and Suffolk alleged that Friends owed them a total of approximately $1,800,000 for breach of contract; Suffolk made an additional claim as well.

Friends's plan for dissolution included a sale of its assets, including the Buten Collection and the Levine Collection, with the proceeds to be used to pay its debts. Friends eventually agreed that it did not own the Buten Collection, and withdrew it from the plan for dissolution in an amended petition filed in December 2006. Ownership of many of the thousands of items in Nassau's possession and obtained for Nassau by Friends is disputed, and these disputes are largely unresolved.

The Wedgwood Society of New York (hereinafter the Wedgwood Society), which brought about the donation of the Levine Collection to Friends, moved for leave to intervene in the proceeding, and its motion was granted in February 2007.

In spring of 2007, Nassau sought an order from the Supreme Court determining that Education Law § 220 (4) and 8 NYCRR 3.27 precluded the sale of "museum objects" that were claimed by Friends in order to pay Friends's creditors. By order entered November 14, 2007, the Supreme Court denied the motion, finding that the rule requiring that assets held by a corporation such as Friends for a limited purpose be used only for that purpose and not for general operating costs or payment of debts did not apply in the dissolution of the corporation (2007 NY Slip Op 33462[U] [2007]). The court held that Friends, under the direction of the court, could sell such objects to pay its debts and the costs of dissolution.

Nassau took an appeal from that order, but then reached a proposed resolution with the secured creditors and Suffolk, which Friends did not oppose, and the appeal was eventually withdrawn. Under the terms of the proposed resolution, which was termed a "settlement," Nassau agreed to the sale of the Levine Collection and the use of the proceeds of that sale, as well

as the Campbell Fund, to pay the secured creditors the principal amount of their loans to Friends, with the remainder of the proceeds to pay the valid claims of unsecured creditors.[1] The secured creditors agreed to waive any shortfall in the event such assets were insufficient to satisfy the principal. Further, Nassau and Suffolk agreed to waive any claims they had against Friends for breach of contract. Suffolk conditioned its approval of the "settlement" on its regaining control of a bank account containing approximately $56,000 in funds held for the Suffolk County Advertising and Sports Funds, and also upon waivers of any claims against it by creditors of Friends.

At a conference held on January 17, 2008, the Supreme Court, having already determined that "museum objects" could be sold to satisfy Friends's debts, identified issues for the parties to address in assisting it to determine whether it would approve the "settlement"; as relevant here, those issues included whether the court had the authority to order that restricted funds (i.e., the Campbell Fund) be used to partially satisfy the claims of secured creditors and whether it had the authority to order the sale of the Levine Collection to partially satisfy the claims of secured and unsecured creditors.

Nassau, Suffolk, the SBA, and the Bank submitted papers arguing that the Supreme Court had the authority to order use of those assets to satisfy creditors and argued in support of approving the settlement, and the Attorney General and the State Education Department, jointly, the Wedgwood Society, and the Agricultural Society of Queens, Nassau and Suffolk Counties, Inc., submitted papers arguing, essentially, that the Supreme Court did not have such authority, and objecting to the settlement.

The Supreme Court issued its decision and order in September 2008 (2008 NY Slip Op 33615[U] [2008]). Acknowledging the tension between the principle that "items donated to a historical entity for a particular use cannot be used to pay the expenses of the historical entity," and the "statutory authority which states that the court, in the exercise of its discretion, shall authorize the sale of assets of a liquidating non-profit corporation to pay its debts," the court determined that it had the authority to order the use of the Campbell Fund and the sale of the Levine Collection, with the proceeds of the sale to pay Friends's

---

1. Friends had asserted in its amended petition that the Campbell Fund contained $276,636.38, and the Levine Collection had been appraised in spring 2006 at $409,645.

creditors (*id.* at \*2). The court reasoned that the law limiting the use of restricted assets to fund operating expenses did not apply to the payment of debts during dissolution.

The Supreme Court also noted, however, that it had the discretion to determine which assets would be sold to pay creditors. In exercising that discretion, the court was required to consider the "donative intent attached to hundreds of museum objects against the expressed intent impressed upon certain assets" (*id.* at \*6). Further, the court considered whether the use of the Campbell Fund to pay debts would impact negatively on the Old Bethpage Village Restoration, the support of which was the main purpose of the Campbell Fund. The court found that, inasmuch as Nassau had agreed to continue to support the Old Bethpage Village Restoration, use of the Campbell Fund to pay Friends's creditors was "less of a[ ] conundrum" than was the proposed sale of the Levine Collection (*id.*).

The Supreme Court noted that "there is no objective proof which has emerged over the several years during which this proceeding has been pending which would enable [Friends] to establish ownership of objects or artifacts now in the possession of Nassau County," and that no one sought to undertake that cumbersome and expensive task (*id.* at \*4). The court found that Friends, thus, was "for all practical purposes without assets" (*id.* at \*7). Moreover, it found that the claims of Friends's creditors were valid.

The Supreme Court concluded that the Levine Collection had no particular importance to Long Island; none of the pieces came from Long Island, and Mark Levine had chosen a Long Island charity for his parents' collection only because his father had spent part of his tragically shortened life in Great Neck. Moreover, the Levine Collection had not been displayed to the public, because Nassau's museums did not have the facilities to properly display it. The court concluded that "[i]f indeed the public does suffer a loss by the removal of the Levine [C]ollection it is at [most] a loss of a treasure it never saw and enjoyed" (*id.*). Consequently, the court determined that it would approve the settlement. This appeal followed.

Before turning to the issues presented in this appeal, we note that the order appealed from did not decide a motion made on notice and is, therefore, not appealable as of right, and leave to appeal has not been granted (*see* CPLR 5701 [a] [2]). Nevertheless, we treat the notices of appeal as applications for leave to appeal, and we grant leave to appeal (*see* CPLR 5701 [c]; *Terio v*

*Spodek*, 63 AD3d 719, 720 [2009]; *Barretta v NBKL Corp.*, 298 AD2d 539 [2002]).

The determination of the principal question before us requires us to examine several statutes. First, inasmuch as Friends was chartered by the Board of Regents, under Education Law § 216 ("Charters"), it is an "education corporation" under Education Law § 216-a, which provides for the applicability to such corporations of the Not-For-Profit Corporation Law (hereinafter N-PCL), but with certain provisos, and "adjusting provisions" (Education Law § 216-a [4]). Important among the provisos is Education Law § 216-a (4) (a), which provides, in pertinent part:

> "If a provision of the not-for-profit corporation law conflicts with a provision of this chapter [the Education Law] . . . , the provision of this chapter . . . shall prevail and the not-for-profit corporation law shall not apply in such case. If an applicable provision of this chapter . . . relates to a matter embraced in the not-for-profit corporation law but is not in conflict therewith, both provisions shall apply."

Pursuant to N-PCL 513 (a), a not-for-profit corporation (hereinafter an NFP) has "full ownership rights" in all assets given or bequeathed for a specified purpose; such assets are not held by an NFP in trust (*see Saint Joseph's Hosp. v Bennett*, 281 NY 115 [1939]). Nevertheless, the rights of the NFP are not without restriction. Pursuant to N-PCL 513 (b), the "governing board" of the NFP "shall apply all assets thus received to the purposes specified in the gift instrument and to the payment of the reasonable and proper expenses of administration of such assets." Assets held for a specific purpose by a "Type B" NFP, such as Friends, must be used for that purpose and the "reasonable and proper expenses of administration of such assets" (N-PCL 513 [b]). Further, accounts relating to those assets must be kept "separate and apart from the accounts of other assets of the corporation" (N-PCL 513 [b]).

An early application of the restriction inherent in the statute was *Saint Joseph's Hosp. v Bennett* (281 NY 115 [1939]). There, the charitable corporation received a bequest from a will, which instructed that the bequest was "to be held as an endowment fund and the income used for the ordinary expenses of maintenance" (*id.* at 117). The Court of Appeals rejected the corporation's attempt to use portions of the principal and income to pay its mortgage debt or in furtherance of corporate purposes

other than the ordinary expenses of maintenance. While holding that the bequest did not create a trust, the Court held that the corporation was nonetheless required to use it for the purpose specified.[2]

It is, thus, clear that assets held for a particular use may not be used for other corporate purposes in the operation of the NFP, including for payment of debts. None of the parties disputes this proposition.

With respect to dissolution, the Education Law itself provides for a procedure to be applied when the Board of Regents has dissolved an educational corporation. As is relevant here, if the educational corporation has assets, a petition must be made to the Supreme Court for "an order directing the disposition of any and all property belonging to the corporation" (Education Law § 220 [1]). After certain procedural requirements have been met,

> "[t]he court shall direct the sale of sufficient designated assets to pay any outstanding debts and the cost of dissolution. The regents and the board of trustees may present to the court their recommendation as to the disposition of the remaining property of the corporation if there be library books, objects of art or of historical significance, as far as possible they shall not be sold but shall be transferred to libraries, museums or educational institutions willing to accept them. If a charter contains a provision indicating a proposed disposition of the assets in case of dissolution, such provision shall be followed by the court in its order as far as practicable. If there be any surplus moneys after payment of debts and the expenses of liquidation, the court may direct that the same be devoted and applied to any such educational, religious, benevolent, charitable or other objects or purposes as the said trustees may indicate by their petition and the said court may approve" (Education Law § 220 [4] [emphasis added]).

This provision is not, however, the only one applicable. As is relevant here, Education Law § 216-a (4) (d) provides:

> "The following adjusting provisions shall apply in

---

**2.** The Court, in so holding, rejected the assertion that such limitations are merely "precatory" and thus not binding (281 NY at 128 [Hubbs, J., dissenting]).

the application of the not-for-profit corporation law under this section: . . .

"(13) The opening clause of paragraph (a) of section eleven hundred two shall read: 'With the consent of the regents of the university of the state of New York, a petition for the judicial dissolution of a corporation may be presented.' "

Inasmuch as this proceeding is a judicial dissolution, article 11 of the N-PCL is thus also applicable. N-PCL 1115 provides that, subject to other article 11 provisions, certain provisions of article 10 (which relates to nonjudicial dissolutions) shall apply. As particularly relevant here, N-PCL 1115 (a) incorporates N-PCL 1008. N-PCL 1008 (a) in turn provides, in relevant part, that the Supreme Court

"may make all such orders as it may deem proper in all matters in connection with the dissolution . . . of the corporation, and in particular, and without limiting the generality of the foregoing, in respect of the following: . . .

"(9) The payment, satisfaction or compromise of claims against the corporation, the retention of assets for such purpose, and the determination of the adequacy of provisions made for payment of the liabilities of the corporation. . . .

"(15) Where assets were received and held by the corporation either for a purpose specified as Type B in paragraph (b) of section 201 (Purposes), or were legally required to be used for a particular purpose, the distribution of such assets to one or more [entities] engaged in activities substantially similar to those of the dissolved corporation."[3]

Similarly, N-PCL 1109 (c), which describes the court's discretion with respect to the final order of dissolution, provides that

"[i]f the judgment or final order shall provide for a dissolution of the corporation, the court may, in its discretion, provide therein for the distribution of the property of the corporation to those entitled

---

**3.** Education Law § 216-a (5) provides that "[e]very corporation to which the not-for-profit corporation law is made applicable by this section, is a type B corporation under all applicable provisions of that law." Friends is, therefore, a Type B corporation.

thereto according to their respective rights. *Any property of the corporation described in subparagraph one of paragraph (c) of section 1002-a (Carrying out the plan of dissolution and distribution of assets) shall be distributed in accordance with that section"* (emphasis added).[4]

The distinction between paragraphs (9) and (15) of section 1008 (a) makes clear that the sale of assets to pay debts is not a "distribution." This conclusion is further buttressed by N-PCL 1002-a (c) (1), which also distinguishes between payment of liabilities and distributions, which occur only *after* payment of creditors:

"Prior to filing the certificate of dissolution with the department of state, a corporation, as applicable, shall: . . .

"(c) Distribute the assets of the corporation that remain after paying or adequately providing for the payment of its liabilities, in the following manner:

"(1) assets received and held by the corporation either for a purpose specified as Type B in paragraph (b) of section 201 (Purposes) or which are legally required to be used for a particular purpose, shall be distributed to one or more [entities] engaged in activities substantially similar to those of the dissolved corporation pursuant to the plan of dissolution and distribution or, if applicable, as ordered by the court to which such plan is submitted for approval under section 1002 (Authorization of plan). Any disposition of assets contained in a will or other instrument, in trust or otherwise, made before or after the dissolution, to or for the benefit of any corporation so dissolved shall inure to or for the benefit of the corporation or organization acquiring such assets of the dissolved corporation as provided in this section, and so far as is necessary for that purpose the corporation or organization acquiring such disposition shall be deemed a successor to the

---

4. After Friends commenced this special proceeding, the Legislature amended the N-PCL (*see* L 2005, ch 726). While the parties do not appear to agree whether the pre- or post-amendment version of the N-PCL is applicable, none maintains that the changes affect the resolution of this proceeding, and the operative language of the statutes at play here is virtually unchanged. For the convenience of the reader, we use the post-amendment version.

dissolved corporation with respect to such assets; provided, however, that such disposition shall be devoted by the acquiring corporation or organization to the purposes intended by the testator, donor or grantor."

All of the statutes thus far reviewed establish that, in the operation of an NFP, assets held for a specific use may not be used for another purpose (*see* N-PCL 513). And, upon dissolution, after liabilities are paid, distribution of such assets that "remain" must be made under the quasi cy pres doctrine to an entity "engaged in activities substantially similar to those of the dissolved corporation" (*see* N-PCL 1002-a [c] [1]; *cf. Sherman v Richmond Hose Co. No. 2*, 230 NY 462, 472-473 [1921]; *see generally* New York Nonprofit Law and Practice § 8.04 [2] [a] [Matthew Bender 2010]).[5] None of the parties disputes these propositions. This appeal, of course, concerns neither situation. It is also undisputed that a court may order the sale or use of unrestricted assets to pay creditors.

The tension here, as the Supreme Court pointed out, and the parties recognize, is between two legitimate interests—the rights of creditors and the limitations imposed by donors under which the NFP holds certain assets. And, both sides warn of dire consequences flowing from the rejection of their position. The appellants warn of a "chilling effect" on charitable giving if prospective donors cannot be confident that their charitable purposes will be honored; various parties on the other side warn of the difficulty struggling charities may have in obtaining credit during times of economic stress if the prospective creditors cannot be certain that they will be repaid out of the valuable assets of the NFP.

---

5. "Cy pres" means, literally, "as near as" (Black's Law Dictionary 444 [9th ed 2009]). New York's version of the doctrine is less strict than the original common-law doctrine ("as near as possible"). As originally made applicable to the Supreme Court's power over charitable corporations, New York's version was stated thusly: "If circumstances have so changed that a literal compliance with the terms of the gift is impracticable, then [the Supreme Court] may order the gift to be administered so as best to accomplish its purpose" (*Sherman v Richmond Hose Co. No. 2*, 230 NY 462, 473 [1921]). That standard has been relaxed in the N-PCL section relating to distribution of limited-purpose assets of a dissolving NFP to require merely that such assets "be distributed to [entities] engaged in activities substantially similar to those of the dissolved corporation" (N-PCL 1002-a [c] [1]). In *Matter of Multiple Sclerosis Serv. Org. of N.Y. (New York City Ch. of Natl. Multiple Sclerosis Socy.)* (68 NY2d 32, 35 [1986]), the Court of Appeals provided various factors for a court to consider when applying this quasi cy pres doctrine.

■ We find that New York's long-standing policy honoring donors' restrictions on the use of the property they donate has greater weight than the claims of creditors. To hold otherwise would be to sanction a gap in the protection of the donors' expressed limitations. The Legislature has provided that NFPs must comply with the limitations imposed by the donors. Moreover, under N-PCL 513 (b), funds relating to such assets must be kept in separate accounts and reports must be made annually to members or the governing board regarding such assets. Further, under 8 NYCRR 3.27 (c) (6) (iv), items in collections cannot, inter alia, be used as collateral for loans. Even in dissolution, the limitations on the use of such assets is required to be honored, and not necessarily to the lesser extent of quasi cy pres. The last sentence of N-PCL 1002-a (c) (1) extends the donors' limitations on use of an asset to the receiving entity. These strong statutory enactments convince us that the Legislature has not expressed an intention, by mere omission, to temporarily render inoperative the limitations during the period of dissolution only to revive them after debts are paid.[6] Rather, it has emphasized the view that the public places greater importance on the limitations on the use of the asset than on which entity actually holds it.

Further, although we in no way wish to minimize the importance of financial losses suffered by creditors, some of which are employees of NFPs, we recognize that, once lost, items in a museum collection, or the items or programs that a limited fund supports, may be lost to the public forever if they may be used to pay debts during liquidation. When the items have been donated without limitation, that may be the unfortunate result. But where the donee has imposed a limitation on the use of the asset, that limitation must be honored in the operation and dissolution of the NFP.

In that respect, we note that, in this proceeding, it is not only the Levine Collection that may be lost to the public, but also the cultural and historical benefit of the Old Bethpage Village Restoration. The Campbell Fund, as a dedicated fund, is not subject to the competing demands on government funds, but

---

6. We acknowledge that the Legislature could have made the limitation on sale of assets to creditors explicit, and that it has not done so in this area, as it has in others (see e.g. N-PCL 1408 [a] [providing that a historical society may "receive donations of articles of historic interest on the condition that in case of its dissolution or inability to pay its debts otherwise than from its effects, such articles shall revert to the donors or their heirs"]).

Nassau, however well intentioned, cannot guarantee its support of the Old Bethpage Village Restoration if the Campbell Fund is extinguished.

■ There is no dispute in this case that the Campbell Fund is an asset held for a specific purpose. In accordance with the foregoing analysis, therefore, we hold that the Campbell Fund may not be liquidated in order to pay the claims of creditors. To do so would be to extinguish the purpose behind the gift.

■ The analysis with respect to the Levine Collection, which also undisputedly is an asset held for a particular purpose, is somewhat different. Certainly, with the dissolution of Friends, the Supreme Court must decide what to do with the Levine Collection. The appellants contend that it may not be sold at all, but must instead be distributed consistent with the doctrine of quasi cy pres. We do not see a sale as completely proscribed by that doctrine, however. If the purpose behind the donation of a charitable asset may be maintained even with a sale to satisfy, or partially satisfy, the claims of creditors, nothing in the law requires that the asset be distributed without charge. We hold with respect to the Levine Collection, therefore, that, consistent with the doctrine of quasi cy pres, the court may provide for its sale, as a single collection, to an entity that is engaged in activities substantially similar to those of Friends, and a condition of the sale shall be that the entity acquiring the Levine Collection, either directly or indirectly, agree to be deemed a successor to Friends with respect to the Levine Collection and to be bound by those conditions of the Loan and Gift Agreement under which Friends acquired it that the court may find to still be practicable. It may be that, with such a restriction, the proceeds from the sale may be less than that of an unrestricted sale. Nevertheless, the policy behind the protection of restricted assets is strong enough to require such a result.

■ Even were we to find that there is no limitation under the law on the use of the Campbell Fund and the Levine Collection to satisfy the claims of creditors, we would nonetheless reverse the order appealed from on the ground that approval of the settlement was an improvident exercise of discretion. There has yet been no determination of the true extent of the assets of Friends (see Education Law § 220 [1]; N-PCL 1104 [a]), owing to the lack of stringent record keeping over the years by both Friends and Nassau, leading to the selection of perhaps the most valuable assets of Friends, both of which were given for limited uses. Before the limited-use requirements relating to

those assets could be extinguished to satisfy the claims of the creditors, a full accounting of Friends's assets must be made.

The parties' remaining contentions either are without merit or need not be addressed in light of the foregoing.

Accordingly, the notices of appeal from the order are deemed to be applications for leave to appeal from the order, leave to appeal is granted, the order is reversed, on the law, on the facts, and in the exercise of discretion, and the matter is remitted to the Supreme Court, Nassau County, for further proceedings consistent herewith.

DILLON, DICKERSON and ENG, JJ., concur.

Ordered that the notices of appeal from the order are deemed to be applications for leave to appeal from the order, and leave to appeal is granted (*see* CPLR 5701 [b], [c]); and it is further,

Ordered that the order is reversed, on the law, on the facts, and in the exercise of discretion, and the matter is remitted to the Supreme Court, Nassau County, for further proceedings consistent herewith; and it is further,

Ordered that the one bill of costs is awarded to the appellants appearing separately and filing separate briefs, payable by the County of Nassau, the County of Suffolk, and the New York Community Bank.